Vern E. ALDEN, Edward R. Albert, F. I. Wennerholm, Nixon W. Elmer, Hazel M. Guerin, H. F. Koepke, Virginia M. Larkin, P. M. Larsen, Agnes E. McCarthy, David H. Moore, John W. Schoen, A. O. Soderholm, F. D. Troxel and George Wickstrom, partners in a limited partnership dba under the name and style of Vern E. Alden Company, Plaintiffs,

v.

CENTRAL POWER ELECTRIC COOP-ERATIVE, Inc., a North Dakota Corporation, Defendant.

Civ. No. 3500.

United States District Court
D. North Dakota,
Northwestern Division.

Sept. 2, 1958.

John C. McKenzie, Chicago, Ill., for plaintiffs.

Theodore Kellogg, Dickinson, N. D., for defendant.

DEVITT, District Judge.

This is an action by a Chicago engineering firm against a North Dakota cooperative power association to recover approximately $104,000 allegedly due for work in designing and supervising the construction of an 8-million-dollar power generating station at Voltaire, in northwestern North Dakota.

The plaintiffs and the Ulteig Engineering Corporation of Fargo, North Dakota, contracted to prepare plans and supervise the construction of the cooperative power plant for a fee based on an agreed formula with a top ceiling of $500,000. The plaintiffs claim that there were changes in the scope of the work, occasioned principally by changes in boiler application, this opinion, with the briefs attached, should be forwarded to the United States Court of Appeals for the Third Circuit and a copy forwarded to New York with the file.

design not contemplated by the contract, and that they are entitled to additional compensation.

The defendant denies that any additional compensation is due. It states that the engineering service contract specifically provided that $500,000 was the maximum engineering fee to be paid unless the parties agreed in writing, and in advance, for increased compensation and that the parties did not do that. The defendant also contends that alterations were made in the plans by the engineer without consultation with the owner, contrary to the terms of the contract, and that the engineer was specifically required to make necessary changes requested by the owner.

The plaintiffs argue that although the contract placed a specific $500,000 ceiling on their compensation, extra work was performed and the conduct and actions of the defendant in connection with it constituted a waiver of that provision.

The defendant has filed a counterclaim based on the theory that the plaintiffs unreasonably delayed the preparation of proper plans and specifications, insisted on impractical plans over the protest of the defendant, and were dilatory in carrying out the terms of their contract as the result of which the plant was belatedly opened and defendant was deprived of the use of the plant for an 8-month period; it is alleged that defendant was compelled to pay heating costs for the unusable plant during one winter, was obligated to pay overtime wages for labor in order to reduce the period of belated opening, was obligated to pay some $10,000 for excessive amounts of electric cable which were unnecessarily ordered by the plaintiffs, and incurred other damages in that plaintiffs improperly excavated and filled the area around the substation. It seeks damages in the sum of about $400,000.

The plaintiffs are partners in the engineering business and specialize in the design and supervision of construction of power stations. The defendant is a corporation organized under the cooperative laws of the State of North Dakota and was formed by eight other North Dakota electrical cooperatives for the purpose of erecting a power station to furnish electrical energy to the members of the eight cooperatives situated principally in central and northwestern North Dakota in an area near the recently completed Garrison Dam.

In the first instance, defendant engaged the Ulteig Engineering Corporation of Fargo, to serve as the engineer for the construction of the planned power plant. Ulteig in turn solicited the professional assistance of plaintiffs. The agreement between the parties is contained in three contracts dated November 26, 1949 between plaintiffs, defendant and Ulteig Engineering Corporation. By its terms, the principal responsibility for the project rested with the plaintiffs. Defendant was to pay compensation directly to the plaintiffs. Application was made to the Rural Electrification Administration of the Department of Agriculture (REA) for a 100% loan to finance the project. Under the statutes and the established policy of the REA, it exercised a rather minute supervision over the project at every stage. The plant was constructed during the period 1950–1952.

In the summer of 1949 the plaintiffs, acting through their principal partner, Vern E. Alden, established first contact with the members of the Board of Directors of the defendant corporation. In August of that year Alden prepared a so-called power plant study, which was to accompany the defendant's application to the REA for the required loan. This study contemplated the use of two boilers, each having a continuous generating capacity of 240,000 pounds per hour with a maximum capacity of 260,000 pounds per hour for two-hour periods. Later, after consultation with boiler manufacturers and a study of the peculiar physical space requirements for a plant burning North Dakota lignite coal, Alden apparently decided that smaller boilers would be more suitable. He therefore recommended and proposed the use of boilers each having a continuous capacity

of 195,000 pounds per hour with a maximum capacity of 225,000 pounds per hour for two-hour periods. This size boiler will subsequently be referred to as the smaller boiler, and the previously mentioned one of greater generating capacity will be referred to as the larger boiler. Alden submitted preliminary plans and specifications, providing for the use of the smaller boilers, to the Board of Directors of the defendant corporation. At a meeting in November of 1949, the Board approved such. The REA never did approve these preliminary plans and specifications. There is conflict in the evidence as to whether or not the Board actually understood, in approving such preliminary plans and specifications, that they provided for the use of smaller boilers.

In an appearance before defendant's Board of Directors during the negotiation period in the summer of 1949, Alden represented that plaintiffs' maximum compensation would be $500,000 but that if he could employ the plans and specifications used in the construction of a similar power plant at Cassville, Wisconsin, it would be possible to reduce the total compensation by some $50,000 to $75,000. The Cassville plant was constructed with the larger type boilers. Both parties apparently contemplated duplicating the Cassville plant, but there is conflict in the evidence as to whether this also included an exact duplication of the larger boilers there employed.

After the Board approved the proposed engineering service contract at its meeting in November, 1949, some of the Board members went to Wisconsin to study other power plants. During that trip, and on or about January 13, 1950, members of the Board claim that they first learned that the plans for the proposed plant in North Dakota contemplated the use of the so-called smaller boiler. They expressed doubt as to the wisdom of using the smaller boilers, claimed ignorance of the fact that they had approved the use of such, and contended that the understanding was that the larger boilers proposed in the so-called power study, and as used in the Cassville plant, were to be employed. As the result of this possible misunderstanding, a meeting was held in the REA offices in Washington on January 25–26, 1950. Shortly prior to this time, a contract had been let for the smaller boilers to the Combustion Engineering Corporation. Representatives of that company, of the plaintiffs, of the defendant, of Ulteig Engineering Corporation and of the REA were present at the Washington meetings.

Vern E. Alden testified that at the meeting he strongly urged the use of the smaller boilers and said that the larger ones would be uneconomical and that substituting the larger ones at that stage would unduly delay construction of the plant. He also claims that he advised the conference that in the event changes were made in the proposed engineering contract so as to provide for the use of the larger boiler, it would entail the incurring of additional engineering fees. Decision was reached by the Board of Directors to build the plant with the larger boilers. The REA officials approved this; Alden proceeded to draw plans accordingly. Negotiations were had with the Combustion Engineering Company to furnish the larger type boilers.

The Korean War started in June of 1950. As a result of this, and later, of a steel strike, considerable difficulty was experienced in securing necessary materials, then in short supply. The plant was energized in the month of February, 1952—about eight months later than the agreed completion date.

■ The law is clear that where the parties have agreed that an engineer's fee shall have a ceiling, and no additional compensation for extras shall be payable except by written agreement in advance, such agreement controls. It is also the law, however, that the parties may waive compliance with the requirement that there be a written agreement

governing extras and ceiling fee. See 17 C.J.S. Contracts § 371.

The basic fact issue is whether or not the parties, by their words and conduct, waived this requirement.

■ What transpired at the Washington conference on January 25 and 26, 1950, may focus considerable light on this question. As might be expected, the versions of the parties differ. Alden claims that he advised the conferees that the engineering costs would be greater if the larger boilers were used. A. C. Soderholm, resident engineer on the project, a plaintiff, and one of the senior partners, testified to the same effect.

Mr. Weltin, member of defendant's Board of Directors, testified that he heard no conversation with reference to additional fees. By deposition Messrs. Bosman and McCurly, both of REA, stated that although they were not present during all of the conference, there was some talk of engineering expenses, but both disavow they heard talk of additional engineering fees. Mr. Duncan of REA testified that he heard no conversation dealing with an increase in the ceiling above $500,000. The testimony of Charles Larson, associated with the Ulteig Engineering Corporation, was to the same effect. Mr. Gerald Olson, then president and now secretary-treasurer of defendant corporation, was at the conference. He testified that Mr. Alden said that if the defendant insisted upon the use of the larger boilers it would mean additional engineering expense and that the contemplated saving of between $50,000 and $75,000, through the use of the so-called Cassville plant plans, could not be made, but that there was no conversation about fees in excess of $500,000.

At the time of the Washington conference in January of 1950, the plaintiffs did not have a firm contract to build the plant. The Board of Directors had approved the proposed engineering contract but the REA authorities had not done so. This was a condition to its effectiveness. At this time plaintiffs had already expended considerable time and money in preparing the power plant study and the preliminary plans and specifications. The defendant was not obligated to compensate them for this.

Alden was asked on the witness stand why he had not proposed a specific amendment to the engineering contract providing for raising the ceiling above $500,000 at the time of, and as a result of the decision reached at, the Washington conference. He answered that, among other reasons, he did not then have a firm contract and he did not want to take the risk of losing it by bringing it up at that time.

Alden wrote two letters which are significant. In a letter dated February 23, 1951 to his associate engineer at Fargo, Mr. M. T. Ulteig, Alden said:

"We have, of course, realized since January of 1950 that it was not going to be an easy thing to complete the engineering for this job within our estimates and we said that to Mr. Olson and the members of the Board at the time they made their decision to go to the use of boilers that were larger than we considered necessary."

Later in the same letter Alden, after setting out the inordinate amount of time his firm had expended on this contract, principally, to obtain priority allocations for needful materials, said:

"The expenditure of this time is beyond the scope of anything that you and I had in mind when we set the ceiling figure of $500,000 for engineering on this job."

Then he said:

"*I rather doubt that it would be wise to hold any discussions with Mr. Olson or with any of the members of the Board of Directors of Central Power Electric Cooperative at this time regarding the possibility that there may be an overrun on engineering.* Such a discussion with Mr. Olson should not be held until after you and I have talked the matter out in some detail and

I think that that discussion better be held here in Chicago where all of our records are available. I think it likely that any discussion with Mr. Olson should not be held until after the *construction work has progressed further and we are well along on the erection of turbines, boilers and other principal equipment."* (Emphasis supplied.)

Subsequently, on March 16, 1951, Alden wrote Ulteig again. *After pointing out that it was possible to complete the job for some $800,000 less than the $8,421,000* estimated for it, Alden said:

"If we are able to hold the capital expenditure to about $7,600,000 it would seem that we might get the Board and REA *to agree to reimburse us for any modest over-run that there may be on engineering costs."* (Emphasis supplied.)

Later, the plaintiffs, through one of their engineers, Wennerholm, requested the defendant Board to approve an amendment to the contract providing for additional compensation. The action of the Board in this regard is reflected in certified copies of the minutes of meetings on June 26, July 12, August 21, September 18, October 16, December 11, 1952. These minutes show that the Board refused these requests for additional compensation until its meeting of September 18 when a proposed amendment was approved and sent to the REA in Washington. That Agency subsequently disapproved it. Thereafter, on December 11, 1952, the Board revoked its approval of such amendment.

The plaintiffs claim that this action of the Board in approving an amendment to the contract for their additional compensation evidences the intention of the defendant throughout *the course of their dealings* to waive the requirement that the engineering fee ceiling be raised *only by written agreement.* The defendant contends that it was always adamant against additional compensation, but was only persuaded to adopt the resolution providing for ad-ditional compensation upon the representation of Wennerholm and Ulteig that that was the only way the matter could be brought to the attention of the REA in Washington, to wit, by their prior approval by the Board. Both Messrs. Olson and Weltin, members of defendant's Board, were asked why they approved the resolution. They said they did so only so that the matter would get before the REA, which approval, they understood, was a condition precedent to REA consideration. They said that they and the members of the Board were always opposed to additional compensation.

On April 1, 1951 and again on January 31, 1952, plaintiffs submitted to defendant and REA a "Revised Estimate of Capital Expenditures" listing the status of the projects under their supervision. In both reports it was estimated that $500,000 was required to complete this engineering work.

The significant features of this recital of facts are Alden's statement that he did not urge a written amendment of the engineering ceiling provision after the Washington meeting because he did not then have a firm contract and he did not want to lose the job, the statements contained in his letters of February 23, 1951 and March 16, 1951, to Ulteig in Fargo, excerpts from which have been quoted above, and the $500,000 ceiling estimate made on April 1, 1951 and January 29, 1952.

This evidence runs counter to any thought that the parties had agreed to waive the written contract with reference to extra compensation. Alden's letters to Ulteig indicate that plaintiffs were depending solely upon the generosity of the Board and REA to afford them additional compensation. There is a marked lack of frankness, almost affirmative concealment, manifest in Alden's letter of February 23 when he counsels against talking to Olson about additional compensation until a later date. These expressions point to the conclusion that the matter of additional compensation in excess of $500,000 had not been broached at the Washington meeting, or

with Olson and the members of the Board until after completion of the contract.

In his letter of March 16, Alden makes reference to the fact that they might be able to get "the Board and REA to *agree* to reimburse us for any modest over-run" on engineering costs. This carries the inference that the plaintiffs were of the view that they were not legally entitled to additional compensation but because of keeping down the overall expenditures below the allocated amount, the Board and REA might be prompted, out of generosity, to afford additional engineering fees. This, too, negatives plaintiffs' contention that they had previously advised the defendant of the need for additional fees and that the written contract had been modified by parol agreement or by conduct of the parties.

Plaintiffs' claim now is wholly inconsistent with their actions before and during the execution of the contract. Thus in April, 1951, in their "Revised Estimate of Capital Expenditures" plaintiffs made no reference to additional needed or expected fees. And on January 29, 1952, just two days before the plant was to be energized, plaintiffs similarly reported $500,000 as the total estimated cost to complete the engineering work.. These reports were sent to defendant and the REA. If plaintiffs claimed additional fees, they should have asserted that claim in these reports and in other dealings with the defendant. But they did not. It was only after completion of the contract that plaintiffs claimed entitlement to additional fees. Then they had to depend, not on a legal claim based in effect on a new parol contract, but on the generosity of the defendant and the REA. Mr. Alden quite frankly indicated to the Court, as he had previously pointed out to Ulteig, that his claim was equitable, addressed to the hoped-for generosity and appreciation of the defendant for a job which he considered well done under difficult circumstances.

The plaintiffs were authorized by Sec. II(c) of Article V of the principal contract " * * * to ask for a revision in the maximum compensation * *" where the scope of the work was modified, but the defendant was only required to give such request "careful consideration", not to grant it. It, and the REA, chose not to grant it.

The simple fact is that the contract specifically provided that the $500,000 ceiling would govern except it be modified in writing and in advance. This was not done.

I find, after considering all of the facts and the inferences to be drawn from them, and the pertinent law, that the written engineering contract was not modified or changed by the parties, that there was no waiver of its provisions, and that plaintiffs are not entitled to additional compensation. Equitably, I could not conclude that the plaintiffs have been unfairly treated or unjustly deprived of deserved additional compensation. They received that for which they bargained. But even if their case were such as to appeal to the conscience of a Chancellor, I doubt if the proof in support of additional compensation, nebulous and incomplete as it was, would support their claim.

The evidence submitted by the defendant in support of its counterclaim for alleged failure of plaintiffs to diligently and competently carry out the terms of the engineering contract does not convince me that it is entitled to recover. There was no showing that the belated completion of the contract was due to the fault of plaintiffs. There was little evidence in support of some, and none in support of other, items of the counterclaim. I find it to be without merit.

The Court will sign Findings of Fact, Conclusions of Law and Order for Judgment in accordance with this memorandum decision. Defendant will please prepare these and a form of Judgment, with copies to plaintiffs' counsel. This is not a final decision for purposes of appeal.